# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

WILLIAM PRIDGEN,                                    Case No. 20-CV-1987 (NEB/JFD)

                Plaintiff,

v.                                                  ORDER ON CROSS MOTIONS FOR
                                                    SUMMARY JUDGMENT
651 CARPETS, INC., BRETT
COURNOYER, and CHERRY
COURNOYER,

                Defendants.

---

William Pridgen was an independent sales representative for 651 Carpets, Inc. until June 2020. After separating from the company, Pridgen sued 651 Carpets and its owners, alleging racial discrimination, retaliation, and failure to pay earned commissions and a bonus. Defendants move for summary judgment on Pridgen's discrimination and retaliation claims, as well as a subset of his claims for unpaid commissions. (ECF No. 34.) Pridgen moves for partial summary judgment on a different subset of his claims for unpaid commissions and related statutory penalties.[1] (ECF No. 29.) For the reasons below, each motion is granted in part and denied in part.

---

[1] Pridgen does not move for summary judgment on the disputed commissions and bonuses, or on any claims against the individual defendants Brett and Cherry Cournoyer. (ECF No. 31 at 26–27.)

## BACKGROUND

### I.    Pridgen's Work for 651 Carpets

651 Carpets sells flooring and countertop products and services in the Twin Cities area. The company is owned by Brett Cournoyer ("Cournoyer"). (ECF No. 42-2 ("Fohrenkamm Dep.")[2] at 125.) Cournoyer's wife, Cherry Cournoyer, has no title at 651 Carpets but works on various projects at the company.[3] ECF No. 42-4 ("Cherry Dep.") at 10, 12.)

Pridgen began working for 651 Carpets as a sales representative in 2017. (ECF No. 42-1 ("Pridgen Dep.") at 42–43.) When he began, he signed an Independent Contractor Agreement in the name of his limited liability company, Yes You Can Realty Group, LLC. (ECF No. 44-14.) No one signed the agreement on behalf of 651 Carpets. (*Id.*)

651 Carpets' compensation package for sales representatives was not written down. Instead, members of management orally explained the compensation, including, critically, its commission structure. (Fohrenkamm Dep. at 135.) Sales representatives were paid on commission. (*Id.*) They were to receive a five-percent commission on all sales generated from a 651 Carpets lead. (*See id.*) And they were to receive a ten-percent commission for "self-generated" sales. (*Id.* at 145.) The parties dispute the requirements

---

[2] Citations to deposition transcripts reference native pagination.

[3] The Court refers to defendant Cherry Cournoyer as "Cherry" throughout this opinion and defendant Brett Cournoyer as "Cournoyer" to avoid confusion.

for earning those commissions. Pridgen maintains that he earned the entire percentage on all sales without qualification. (Pridgen Dep. at 48–49.) Defendants contend that commissions could be reduced for several reasons, including if the sales representative: sold the product below the "exception" price; underestimated the amount of product required for a job, *i.e.*, was "short"; or failed to follow up with a customer. (*See* Fohrenkamm Dep. at 135–41; ECF No. 44-22 ("Cournoyer Dep.") at 22.) Sales representatives earned the commission once the job was paid in full.

651 Carpets' sales representatives could also earn bonuses for reaching monthly sales goals. (Fohrenkamm Dep. at 155.) The parties dispute whether 651 Carpets offered a three-percent bonus for reaching $300,000 in monthly sales. (*Compare id.* at 156, *and* Cournoyer Dep. at 116, *with* Pridgen Dep. at 44.)

Pridgen was a productive sales representative in 2018 and 2019, winning incentive trips to stay in Cournoyer's condominium in Florida each of those years. (*See* Fohrenkamm Dep. at 68, 100; Cournoyer Dep. at 78.)

Beginning in late 2019, Pridgen took leaves of absence from work for a series of reasons: first, he had a medical issue; and second, he married and went on an extended holiday in December–January. (Pridgen Dep. at 105–06, 110–11, 215; Cournoyer Dep. at 79–80.)

II.     **Spring 2020**

Spring 2020 was a challenging time at 651 Carpets, as the company was in the process of transferring to a new software system. (ECF No. 42-3 ("O'Reilly Dep.") at 13.) The new system allowed 651 Carpets better access to information about its sales. Defendants contend that during this time, they noticed a decline in the quality of Pridgen's work. (*Id.* at 30–31.) He took some time off with short notice, refused to respond to some customers, and sold product below the exception price more frequently than other sales representatives. (*E.g.*, Fohrenkamm Dep. at 34, 47; O'Reilly Dep. at 28–31.)

For his part, Pridgen noticed a difference in the workplace in 2020, which he attributes to racial discrimination. He claims that he was assigned customers with names "that sounded Black" or who were in majority-Black neighborhoods. (*E.g.*, Pridgen Dep. at 133 ("I would get a lot of—like, any kind of Ahmed or, you know, any type name that sounded Black. Sometimes it would be in North Minneapolis . . . ."); *id.* at 135, 137–38, 140.) He also claims that he was given less lucrative leads, such as those in far-flung locations or small jobs. (*Id.* at 198.)

In May 2020, Pridgen's sales exceeded $300,000—a first for any sales representative. (ECF No. 44-25 ("Lunzer Dep.") at 84–85.) Consistent with his understanding of the compensation structure, Pridgen expected a three-percent bonus of $9,000. He relayed that expectation to Cournoyer and managers by text: "Thought I would've heard congratulations by now[.] Crushing 300k almost 340k. Will be looking

4

forward to 3% bonus thank you." (ECF No. 44-4 at 1.) Sales Manager J.R. Lunzer, Director of Operations Dave Fohrenkamm, and Cournoyer responded to Pridgen's text by stating, respectively: "I have not seen the numbers yet but I will give you a premature congratulations! That's very impressive!!"; "Still trying to get the numbers, but congratulations on a great month regardless! Good work"; and, "A lot tougher to look now with the new system but wowzers!!! Bad ass great job!!!!!" (*Id.* at 1–2; *see* ECF No. 44 ¶ 42 (identifying group text members).) None responded to Pridgen's reference to a three-percent bonus. They testified that they wanted to review Pridgen's sales before deciding whether and how much of a bonus to award Pridgen for the sales. (*E.g.*, Fohrenkamm Dep. at 163–64.)

After his successful May, Pridgen learned that a White sales representative had requested and received time off after a particularly strong month. (Pridgen Dep. at 150–52 (discussing sales representative Matt Sarkela).) Pridgen maintains he "didn't get the same treatment," though his request for similar time off was approved. (*Id.* at 152, 154.)

### III.     June 16–25, 2020

*Pridgen's COVID-19 request*. On June 16, Pridgen informed Lunzer that he would be taking time off because he had been exposed to COVID-19. (ECF No. 44-5 at 1.) When Cournoyer learned of Pridgen's request, he texted Fohrenkamm, "We need to set a hard line with [Pridgen]! He can't keep doing this to us. He can't leave us hanging when we are busy[.] [N]ow we will loose [*sic*] money. Take him off the calendar for good! We can't

have someone this unreliable doing leads." (*Id.* at 2; ECF No. 44 ¶ 43 (identifying Cournoyer and Fohrenkamm as members of text chain).) Cournoyer testified that when he wrote to take Pridgen off the leads calendar "for good," he meant "take him off the calendar until we speak to him and go over the problems that he's having at the moment so we can solve it, so he can go back to work and work like he did in the past." (Cournoyer Dep. at 25.) When Cournoyer learned that no one had met with Pridgen, he texted Fohrenkamm, "Someone needs to call him and have a talk about his bonus going forward and working expectations[.] It can't go another day without speaking to him. He will say we owe him another bonus I already can't get out of the one[.]" (ECF No. 44-5 at 3.) Fohrenkamm responded that they were "[s]till talking." (*Id.*)

On June 19, Pridgen notified Lunzer and Fohrenkamm that he could return to work on June 23. (ECF No. 44-8.) Lunzer told Pridgen—incorrectly—that he was "back on the schedule late and your spot didn't fill up." (ECF No. 44-7 at 2.)

*Pridgen's call with O'Reilly*. By June 24, Pridgen was concerned about not having been assigned any leads. He called Amanda O'Reilly, the company's Customer Service Manager and Inventory Manager and Cherry's half-sister. (O'Reilly Dep. at 12-13, 16.) Pridgen stated that he told O'Reilly that he did not know what was going on because he was not put back on the leads calendar. (Pridgen Dep at 159.) According to Pridgen, he asked O'Reilly: "Do you know what's going on? . . . Is this about race?" and "she said: I'm sorry. I thought we would be farther along in this day and age, but it is racial." (*Id.*)

O'Reilly disputes this account. She testified that she remembers speaking with Pridgen, but does not recall him asking her whether what he perceived as mistreatment by 651 Carpets stemmed from race discrimination; she believes that she would have remembered if he had done so. (O'Reilly Dep. at 42.)

The next day, Pridgen texted Lunzer and Fohrenkamm that he was "ready to come back" to work. (ECF No. 44-7 at 3; *see* ECF No. 44 ¶ 45.)

### IV.   June 26, 2020

The parties dispute what happened two days later, on June 26. Lunzer attests that Pridgen told him over the phone, "I'm not taking leads until I get my bonus" for his May performance. (Lunzer Dep. at 98; *see id.* at 132.) Pridgen does not recall doing so. (Pridgen Dep. at 178–79.)

That morning, Pridgen texted Fohrenkamm and Cournoyer asking why he had not received his bonus. (ECF No. 44-16 at 1; *see* ECF No. 44 ¶ 54.) Fohrenkamm explained that "[b]onuses are still under review for accuracy . . . ." (ECF No. 44-16 at 1.) Pridgen texted a "formal written request for my compensation bonus 3% which equals $9000." (*Id.*)

*Pridgen's first call with Cherry Cournoyer*. Pridgen testified that he called Cherry on June 26 because 651 Carpets "didn't have a check, didn't have my bonus. I was upset." (Pridgen Dep. at 171.) Cherry responded that "we don't know what your margins are." (*Id.*) He testified, "I believe that's when I asked her about race," and Cherry "got a little

upset," and said that she felt threatened and planned to talk to an attorney. (*Id*. at 171–72.)

Cherry remembers the call differently. She testified that she called Pridgen, and that Pridgen said he was expecting a bonus and wasn't happy, and would not take any more leads until he got his bonus. (Cherry Dep. at 21, 23–24.) Cherry told him that she understood that Pridgen did not qualify for the bonus but she would get more information and get back to him. (*Id.* at 21.)

Pridgen's friend Rudy Spelker corroborated Pridgen's view of the call. He testified that he listened in on the call, and that at some point, Pridgen told Spelker that he was terminated. (ECF No. 44-32 ("Spelker Dep.") at 30–31, 33–34.)

*Pridgen's contacts with Cournoyer and Fohrenkamm*. At first, Pridgen testified that after he spoke with Cherry, Fohrenkamm, and Cournoyer called him "and let [him] go." (Pridgen Dep. at 177–78.) No phone records support this call and Pridgen now appears to have abandoned his assertion that this call occurred.

At 2:19 p.m., Pridgen texted Cournoyer and Fohrenkamm, "Am I getting a check or are we lawyering up?" (ECF No. 44-16 at 2.) Moments later, Cournoyer responded, "I advise you to stop texting me and anyone that has anything to do with my business! Cherry spoke to you and will call you back today!" (*Id.* at 2.)

*Pridgen's second call with Cherry Cournoyer*. Cherry testified that she and Cournoyer wanted to keep Pridgen happy, so they decided to pay him $9,000 and ask him to sign a

document acknowledging that it was not an earned bonus. (Cherry Dep. at 27–28.) Cherry called Pridgen again. (Pridgen Dep. at 178.) Pridgen testified that Cherry told him that they would pay him, but that he would have to sign certain documents. (*Id.*) Pridgen refused. (*Id.*) He told Cherry that he felt Defendants "were being racist." (Cherry Dep. at 30–31.) Cherry told Pridgen this was not true and that he was making her uncomfortable, and she ended the conversation. (*Id.* at 31.)

## V.    Litigation

In September 2020, Pridgen sued 651 Carpets and the Cournoyers individually. (ECF No. 1 ("Compl.").) He alleges two race discrimination claims and a reprisal claim under the Minnesota Human Rights Act ("MHRA") against 651 Carpets. He also asserts claims of race discrimination and retaliation under 42 U.S.C. Section 1981, as well as retaliation and wage theft under the Minnesota Payment of Wages Act ("MPWA") against all Defendants. He seeks recovery of unpaid commissions and the May 2020 bonus, as well as statutory penalties. Pridgen first alleged nonpayment of $64,470.71 in commissions and bonuses. (*Id.* ¶¶ 45, 47.) He revised these numbers after discovery, now claiming nonpayment of commissions and bonuses totaling $29,700.62. (ECF No. 43 at 47; ECF No. 32-19.)

## ANALYSIS

### I.   Legal Standard

"Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012) (citing Fed. R. Civ. P. 56(c)). A dispute of fact is "genuine" if a factfinder could reasonably determine the issue in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a summary judgment motion must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences supported by the evidence. *B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist.*, 732 F.3d 882, 886, 888 (8th Cir. 2013). The movant bears the burden of demonstrating an absence of a genuine dispute of material fact. *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019). "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and citation omitted).

## II.     Race Discrimination Claims

Pridgen alleges that Defendants discriminated against him based on his race in violation of the MHRA and 42 U.S.C. Section 1981. Minn. Stat. § 363A.08; 42 U.S.C. § 1981. The MHRA protects Minnesota citizens from discrimination in employment, and bars the termination of, or discrimination against, employees based on race or national origin, among other characteristics. Minn. Stat. § 363A.08, subdivs. 1–2. Section 1981 "prohibits racial discrimination in all phases and incidents of a contractual relationship." *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 468 (8th Cir. 2009) (quotation marks and citations omitted). The parties agree that the same legal analysis applies to both claims. (*E.g.*, ECF No. 43 at 44); *see Saulsberry v. St. Mary's Univ. of Minn.*, 318 F.3d 862, 866 (8th Cir. 2003) ("[T]he elements of a MHRA . . . and § 1981 discrimination claims are the same.").

To survive a motion for summary judgment on the race discrimination claims, Pridgen must either "present admissible evidence directly indicating unlawful discrimination," or "create an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Young v. Builders Steel Co.*, 754 F.3d 573, 577 (8th Cir. 2014) (quotation marks and citation omitted). Pridgen does not present direct evidence of racial discrimination, so the Court applies the *McDonnell Douglas* framework. *Xuan Huynh v. U.S. Dep't of Transp.*, 794 F.3d 952, 958 (8th Cir. 2015). Under this framework, Pridgen must first make a prima facie case of discrimination by showing that: (1) he is a member of a protected class; (2) he was

11

otherwise qualified for his job; (3) he suffered an adverse employment action; and (4) circumstances permit an inference of discrimination. *Banks v. Deere*, 829 F.3d 661, 666 (8th Cir. 2016). If Pridgen makes such a showing, the burden shifts to Defendants to establish a legitimate, nondiscriminatory reason for Pridgen's adverse employment action. *Id.* If they do, the burden shifts back to Pridgen to show that Defendants' purported reason was pretextual. *Id.*

### A.    Prima Facie Case

The parties agree that Pridgen satisfies the first two elements of the prima facie case: he is a member of a protected class based on his race and was qualified for his job. They disagree on the third and fourth elements: whether Pridgen suffered an adverse employment action, and whether the circumstances permit an inference of discrimination.

*Adverse employment action.* An adverse employment action is "a tangible change in working conditions that produces a material employment disadvantage, including but not limited to termination[ and] cuts in pay or benefits." *Jackman v. Fifth Jud. Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013). Pridgen alleges two adverse actions: nonpayment of his bonus and termination of his contract.

As for nonpayment of Pridgen's bonus, it is undisputed that 651 Carpets failed to pay him any bonus for his sales in May 2020. Defendants dispute the amount of the bonus: Pridgen asserts he earned a three-percent bonus for exceeding $300,000 sales. 651

Carpets asserts that it offered no such bonus, and in any event, Pridgen's performance issues would preclude it. The record supports the conclusion that 651 Carpets offered bonuses for reaching monthly sales goals that were less than $300,000. (*E.g.*, Fohrenkamm Dep. at 155–56 (testifying that 651 Carpets offered bonuses for reaching $150,000 or $200,000 in monthly sales).) And Pridgen offers evidence that 651 Carpets paid such bonuses regardless of sales representatives' performance issues. (*Id*. at 161 (testifying that sales representatives who reached monthly bonus sales goals received bonuses even if they failed to satisfy other conditions).) The evidence before the Court raises a genuine issue of material fact as to the bonus *amount* owed to Pridgen. But Defendants' failure to pay Pridgen *any* bonus for his May 2020 sales constitutes an adverse employment action.

As for the termination of Pridgen's contract, the parties also dispute whether Pridgen quit or was fired. Although Pridgen originally argued that he was terminated during a telephone call with Cournoyer and Fohrenkamm on June 26, he now concedes that no such call occurred. He asserts instead that he was terminated during the earlier call with Cherry. As evidence, he offers the testimony of Spelker, who was present during that call. (*See* ECF No. 43 at 16–17 (citing Spelker Dep.).) Pridgen also buttresses his assertion with a text that he sent the same day to former sales representative Robert Hill, stating that Defendants "fired me today and said they are not paying me my bonus." (*See* ECF No. 43 at 19 (citing ECF No. 44-49); *see also* Lunzer Dep. at 129 (testifying that he understood that Pridgen "was told . . . you don't work for us anymore").) "Credibility

13

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Anderson*, 477 U.S. at 255. And 651 Carpets previously took the position that Pridgen was terminated. (*E.g.*, ECF No. 44-57 at 3 (state-court interrogatory answer stating that 651 Carpets "made the business decision to terminate the independent contractor agreement").) Considering the evidence in the light most favorable to Pridgen, the Court finds that a genuine issue of material fact exists about whether Pridgen was terminated.

   *Circumstances inferring discrimination.* There is also a genuine issue of material fact regarding the final element of a prima facie case—whether circumstances permit an inference of discrimination. Pridgen testified that customer service manager O'Reilly responded affirmatively to Pridgen's question about whether he was being treated differently based on race. (*Compare* Pridgen Dep. at 171 (testifying that O'Reilly told him "it was race-related"), *and* ECF No. 44-31 ("A. Pridgen Dep.") at 29 (testifying that O'Reilly "said it was racially motivated"), *with* O'Reilly Dep. at 42 (not recalling Pridgen raising racial discrimination during their call).) O'Reilly is not Pridgen's supervisor and was not involved with scheduling, but she is related to the Cournoyers. (Pridgen Dep. at 161; O'Reilly Dep. at 16, 41.) Although self-serving, Pridgen's testimony is not to be discounted at the summary judgment stage. *See Stewart v. Rise, Inc.*, 791 F.3d 849, 860 (8th Cir. 2015) (explaining that "the self-serving nature of affidavits, interrogatory answers, or deposition testimony" does not "make such evidence inherently infirm").

14

Pridgen also testified that he was assigned leads with names "that sounded Black." (Pridgen Dep. at 133; *see id.* at 138 (identifying names "like Mohammed or Achmed or Ahmed"); ECF No. 42 ¶ 3; *see* ECF No. 42-12 at 1, 3 (list of leads that includes a customer named "Mohamed" assigned to Pridgen).) Hill similarly testified that Cournoyer told him to assign a customer whose name sounded African American to Pridgen because he is Black. (ECF No. 42-5 ("Hill Dep.") at 8.) And Hill testified that he heard Cherry use the n-word in the background of a phone call that Hill had with Brett Cournoyer. (*Id.* at 13–18); *see Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 866 (8th Cir. 2006) (An "employee may attempt to prove causation by providing evidence of the employer's discriminatory comments.").

In addition, Pridgen offers the testimony of a Black co-worker who testified that she was criticized about her attendance while White co-workers' similar behavior went unpunished. (ECF No. 44-29 ("Davis Dep.") at 66–70, 75–76.) Considering the totality of the evidence in the light most favorable to Pridgen, the Court finds that he has raised a genuine issue of fact as to the circumstances inferring discrimination.

**B.     *Legitimate Non-Discriminatory Reason***

Assuming Pridgen established a prima facie case of race discrimination, Defendants have presented a legitimate, nondiscriminatory reason for their conduct. *Torgerson*, 643 F.3d at 1046. "The burden to articulate a nondiscriminatory justification is

not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." *Id.* at 1047 (citation omitted).

Defendants offer legitimate reasons for their actions. As for not paying Pridgen's May 2020 bonus, Defendants maintain that they did not pay it because they were still reviewing Pridgen's sales. And if Defendants terminated Pridgen, they offer a legitimate reason for doing so: evidence suggests that they had issues with Pridgen's performance during the months before his separation. For example, Pridgen sold below "exception" prices without prior authorization more often than other sales representatives, refused to follow up with customers, and was unavailable to take leads for an extended period of time. As they had done with other sales representatives (*e.g.*, Hill), Defendants removed Pridgen from the leads calendar until those issues were addressed. (Cournoyer Dep. at 27.) Pridgen was upset about not receiving his bonus, and the situation reached an impasse.

## C.   *Pretext*

The burden therefore falls on Pridgen "to produce evidence sufficient to create a genuine issue of material fact regarding whether [Defendants'] proffered nondiscriminatory justifications are mere pretext for intentional discrimination." *Torgerson*, 643 F.3d at 1046 (citation omitted). Pridgen may show pretext, among other ways, by showing that 651 Carpets "(1) failed to follow its own policies, (2) treated

16

similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010).

*Nonpayment of bonus.* As explained below, although there may be evidence that Defendants withheld Pridgen's bonus after he threatened to sue, supporting a retaliation claim, the evidence does not support a race-discrimination claim. The record shows that the failure to pay Pridgen's bonus was not unique to him; rather, 651 Carpets regularly balked at paying its sales representatives what they believed they were owed. Pridgen acknowledged that "[i]t was kind of a constant fight. *And not just for me*, but for—you know, we talked as reps and it was pretty much a general knowledge that he would try not to pay us on things we earned." (Pridgen Dep. at 59 (emphasis added).) Hill testified that as a sales representative, "you had to fight for your money with [651 Carpets], they wouldn't pay you. . . . [T]hey wouldn't pay bonuses, [for] months we wouldn't get our bonuses." (Hill Dep. at 10; *see also* ECF No. 42-6 ("Vincent Dep.") at 13–15 (former sales representative John Vincent testifying that 651 Carpets reduced commissions).)

*Termination.* The termination claim presents a different circumstance. Assuming that Pridgen was terminated, he has raised a genuine issue of material fact as to whether Defendants' stated reasons for his termination were pretextual. Defendants argue that even if Pridgen was terminated, he was not the first sales representative they removed from the leads calendar. (*See* Fohrenkamm Dep. at 128–33 (explaining that sales representatives Hill, Toby Goodmanson, and Jeremey Wirta were removed from the

leads calendar because of performance issues).) But evidence suggests that being removed from the leads calendar temporarily was different from being removed from the calendar permanently. Assuming a jury finds that Pridgen was terminated, Defendants point to no other sales representative who was involuntarily removed from the leads calendar permanently. And, as noted above, evidence could support the conclusion that when assigning leads, Defendants treated Pridgen differently than other sales representatives because of his race. (*See* Pridgen Dep. at 133, 138; Hill Dep. at 8.) Given the factual dispute about whether Pridgen was temporarily or permanently removed from the leads calendar, a genuine issue of material fact exists as to whether Defendants' reasons for removing Pridgen from the leads calendar were pretextual.

## III.   Reprisal and Retaliation Claims

Pridgen raises retaliation claims under the MHRA and Section 1981 based on his report of racial discrimination, and under the MPWA based on his report of the nonpayment of compensation. (ECF No. 43 at 32.) Defendants move for summary judgment on Pridgen's MHRA reprisal claim and Section 1981 retaliation claim.[4]

The MHRA makes it unlawful for "any individual who participated in the alleged discrimination as a perpetrator, employer, . . . or employee or agent thereof to intentionally engage in any reprisal against any person because that person . . . opposed

---

[4] Defendants do not address Pridgen's MPWA retaliation claim, but courts in this district have analyzed such claims using the same test as the other retaliation claims. *E.g.*, *Hull v. ConvergeOne, Inc.*, 570 F. Supp. 3d 681, 695–96 (D. Minn. 2021).

a [discriminatory] practice forbidden under [the MHRA]." Minn. Stat. § 363A.15(1). Section 1981 similarly "prohibit[s] employers from retaliating against employees for opposing racial discrimination." *Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 737 (8th Cir. 2013). Like discrimination claims, MHRA reprisal claims and Section 1981 retaliation claims may be proven with direct or indirect evidence. Pridgen seeks to prove these claims using each type of evidence.

### A.   *Direct Evidence*

Direct evidence requires a "specific link" between the alleged animus and the termination sufficient to support a substantially strong inference that the employer acted based on that animus. *Naguib v. Trimark Hotel Corp.*, 903 F.3d 806, 811 (8th Cir. 2018) (citation omitted). "Direct evidence does not include statements by decisionmakers that are facially and contextually neutral." *Id.* (citation omitted). Pridgen's direct evidence of retaliation precludes summary judgment. When speaking with Cherry on June 26, Pridgen asked if Defendants' failure to pay his bonus was related to his race. (Pridgen Dep. at 171; Cherry Dep. at 30–31.) That same day, Pridgen texted Cournoyer and Fohrenkamm, "Am I getting a check or are we lawyering up?" (ECF No. 44-16 at 2.) Fohrenkamm testified that Pridgen's threat to sue Defendants caused him to stop reviewing Pridgen's eligibility for a bonus, and that because the review was not completed, Pridgen was not paid any bonus. (Fohrenkamm Dep. at 161–62.) The Court concludes that this evidence raises a genuine issue of material fact as to whether

Defendants retaliated against Pridgen for his reports of racial discrimination and nonpayment of compensation.

### B.    Indirect Evidence

Pridgen also points to indirect evidence of retaliation. Like discrimination claims, the Court analyzes retaliation claims supported by indirect evidence using the *McDonnell Douglas* burden-shifting framework. *See Naguib*, 903 F.3d at 811.

*Prima facie case.* To establish a prima facie retaliation claim, Pridgen must prove that: (1) he engaged in protected activity; (2) subsequent materially adverse action was taken against him by his employer; and (3) the materially adverse action was causally linked to his protected activity. *Ellis v. Houston*, 742 F.3d 307, 323 (8th Cir. 2014) (addressing a § 1981 retaliation claim); *Chivers v. Wal-Mart Stores, Inc.*, 641 F.3d 927, 932 (8th Cir. 2011) (applying this prima facie test to an MHRA reprisal claim). The parties agree that Pridgen engaged in protected conduct when he sought to enforce his rights by threatening to sue Defendants for failing to pay him his bonus. The parties disagree about the other two elements.

Pridgen claims that both his termination and Defendants' failure to pay his May 2020 bonus were subsequent materially adverse actions. As for the alleged termination, as explained above, a genuine issue of material fact exists about whether Pridgen quit or was fired from his position at 651 Carpets. The timing of his alleged termination vis-à-vis his threat to sue is likewise a genuine issue of material fact. As for Pridgen's bonus,

Defendants argue that their refusal to pay it was not a subsequent materially adverse action because they decided to withhold this bonus on June 16, before Pridgen engaged in protected conduct on June 26. In essence, they argue, the withheld bonus was the *precursor* to the threat to sue, not the other way around.

The evidence suggests that Defendants intended to pay Pridgen a bonus at some point, but they abandoned this plan after Pridgen threatened to sue them. (*E.g.,* Fohrenkamm Dep. at 161–62.) This evidence raises a genuine issue of material fact about whether Defendants' failure to pay the bonus is a subsequent materially adverse action. *See Hull*, 570 F. Supp. 3d at 696 (finding plaintiff stated an adverse employment action where he allegedly earned certain commission payments and requested payment, and defendant allegedly agreed to pay only some of the requested commission if plaintiff waived legal claims involving the commission); *Phillips v. Collings*, 256 F.3d 843, 848 (8th Cir. 2001) ("[A]ctions short of termination or decrease in pay may still constitute adverse employment actions.").

The evidence also supports the third element for both termination and nonpayment of the bonus, as it suggests that Pridgen's termination (if he was indeed terminated) and Defendants' continued withholding of a bonus were causally linked to his protected activity. "[T]emporal proximity between protected activity and an adverse employment action can contribute to establishing the third element of a prima facie case of retaliation." *Davison v. City of Minneapolis*, 490 F.3d 648, 657 (8th Cir. 2007). Pridgen

21

threatened to sue on June 26. That same day, his relationship with 651 Carpets ended and Defendants abandoned their plan to pay the bonus. The temporal proximity between Pridgen's complaint and the adverse employment actions is short—a single day—and forms the basis for an inference that Defendants' actions were in retaliation for making a discrimination claim. *See E.E.O.C. v. Kohler Co.*, 335 F.3d 766, 774 (8th Cir. 2003) ("[T]emporal proximity rises in significance the closer the adverse activity occurs to the protected activity."). The Court thus finds that genuine issues of material fact exist as to Pridgen's prima facie case of retaliation.

*Legitimate, non-retaliatory reason*. Assuming Pridgen proves a prima facie case, Defendants bear the burden of articulating "a legitimate, non-retaliatory reason for the action." *Naguib*, 903 F.3d at 811 (citation omitted). As discussed above, Defendants have articulated legitimate reasons for not paying Pridgen's bonus, and for taking Pridgen off the leads calendar days before he engaged in the alleged protected activity.[5]

*Pretext*. Pridgen thus bears the burden to show that the stated legitimate, non-retaliatory reasons are pretextual. *Id.* "To prove pretext in a retaliation case, the plaintiff must both discredit the asserted reason for the adverse action and show the circumstances permit drawing a reasonable inference that the real reason for the adverse action was retaliation." *Id.* (cleaned up). The record supports evidence of pretext.

---

[5] Defendants also argue that Pridgen was not terminated from his position at 651 Carpets, but as noted above, that is an issue of fact for a jury to decide.

Fohrenkamm testified that 651 Carpets was reviewing Pridgen's work to determine whether he was eligible for a bonus but stopped the review after he threatened litigation. (Fohrenkamm Dep. at 161–62.) And Fohrenkamm testified that 651 Carpets never withheld a bonus because a sales representative failed to meet all of its conditions. (*Id.* at 161.) The Court finds that genuine issues of material fact preclude summary judgment on pretext, and thus denies Defendants' motion on the retaliation claims.

### IV.   Section 1981 Claim against Cherry Cournoyer[6]

Defendants argue the Section 1981 claim against Cherry should be dismissed because she did not have supervisory authority over Pridgen. (ECF No. 36 at 29–32.) Section 1981 "does not provide a general cause of action for race discrimination." *Gregory*, 565 F.3d at 468 (citation omitted). Although the Eighth Circuit has not addressed this type of claim, other courts have held that relief is available under Section 1981 "where a party discriminatorily uses its authority to preclude an individual from securing a contract with a third party." *Harris v. Allstate Ins. Co.*, 300 F.3d 1183, 1197 (10th Cir. 2002). "[T]his requires the individual to show that the party both possessed sufficient authority to significantly interfere with the individual's ability to obtain contracts with third parties, and that the party actually exercised that authority to the individual's detriment." *Id.; see also Daud v. Gold'n Plump Poultry, Inc.*, No. 06-CV-4013 (DSD/JJG), 2007 WL 1621386, at *8

---

[6] Defendants also argue that the Court should dismiss the MHRA claim against Cherry, but Pridgen did not bring an MHRA claim against her. (Compl. ¶¶ 70–73 (asserting an MHRA claim solely against 651 Carpets).)

(D. Minn. May 11, 2007) (same), *report and recommendation adopted*, 2007 WL 1674021 (D. Minn. June 5, 2007).

As for whether Cherry had sufficient authority, Cherry testified that she is not involved in managerial decisions related to the employment, retention, or termination of employees or independent contractor relationships at 651 Carpets. (Cherry Dep. at 10–13.) Other testimony suggests that she had some involvement in employee matters. For example, Cherry talked with former sales representative Hill about his performance before he separated from 651 Carpets the first time. (Hill Dep. at 47 (testifying that he did not know if it was Cherry or Fohrenkamm who told him he was no longer going to take any leads); *see* Cournoyer Dep. at 87 (testifying that Cherry and Hill had a conversation about him not showing up for leads "and he went his separate way").)

As for whether Cherry exercised her authority, Pridgen contends that she was involved in the events surrounding Pridgen's separation from 651 Carpets and that she fired him. (ECF No. 43 at 49–50.) The record suggests that Cherry was involved in Pridgen's separation: it was Cherry, not other 651 Carpets' personnel, who contacted Pridgen on the day he was allegedly terminated. (*E.g.*, ECF No. 44-16 at 2 (Brett's June 26 text to Pridgen "to stop texting me and anyone that has anything to do with my business! Cherry spoke to you and will call you back today!").) But Pridgen has changed his story over time. Before, Pridgen claimed that first he spoke to Cherry, then was fired during a subsequent call with Cournoyer and Fohrenkamm. (Pridgen Dep. at 171–73; ECF No. 42-

10 at 7.) Now, Pridgen claims that Cherry fired him during a phone call, and cites the testimony of Spelker, who listened in on that call. But Spelker's testimony is unclear about when Pridgen was fired. (Spelker Dep. at 30–31, 33–34 (attesting in part that Pridgen was fired "the same day but . . . before that actual conversation"); *see also* A. Pridgen Dep. at 33 (attesting that she "d[id]n't know if [Cherry]'s the one that told him that he was fired or if it was [Cournoyer]").) It is uncertain whether Cherry "possessed sufficient authority" to significantly interfere with Pridgen's ability to keep his position or obtain his bonus, or actually exercised that authority to Pridgen's detriment. *Harris*, 300 F.3d at 1197. The Court must consider the evidence in Pridgen's favor as the nonmovant, and thus it finds that a genuine issue of material facts exists and denies summary judgment on this claim.

## V.     MPWA Claims

The parties also move for summary judgment on some of Pridgen's claims for unpaid commissions. The Court first addresses Defendants' assertions that Pridgen lacks standing to assert unpaid-commission claims and that some of these claims are time-barred. Then it addresses whether genuine issues of material fact preclude summary judgment on these claims.

### A.     *Proper Party*

Defendants argue that Pridgen lacks standing to bring claims under Minnesota Statute Section 181.145 because the independent contractor agreement was between 651

Carpets and Pridgen's LLC, not Pridgen himself. Defendants rely on *McClure v. Davis Engineering, L.L.C.*, 716 N.W.2d 354 (Minn. Ct. App. 2006), to assert that Pridgen's LLC is the "proper plaintiff."[7] *Id.* at 355 n.1. In *McClure*, the plaintiff was the individual doing business as the company that he owned. *Id.* The court did not hold that the individual plaintiff lacked standing to sue under Section 181.145. Rather, the court considered whether a corporation may be a "commission salesperson" under Section 181.145, subdivision 1, and found that it could be. *Id.* at 358. Section 181.145, subdivision 1 provides that a "commission salesperson" is "a person who is paid on the basis of commissions for sales and who is . . . an independent contractor." Minn. Stat. § 181.145, subdiv. 1. The Court finds *McClure* inapposite given these facts.

651 Carpets has argued that both Pridgen *and* his LLC are bound by the Independent Contractor Agreement. (*See* ECF No. 53-1 (651 Carpets' state-court complaint against Pridgen's LLC and Pridgen individually for breach of the agreement).) Setting that aside, 651 Carpets did not execute the Independent Contractor Agreement, and the agreement does not address commissions or other compensation. (ECF No. 44-14.) And Defendants have admitted that *Pridgen*, not his LLC, earned the commissions at issue. (*See, e.g.*, ECF No. 32-10 at RFA No. 8 ("Pridgen was paid pursuant to the terms of

---

[7] The footnote in *McClure* on which Defendants rely states only that "Paul McClure is the president of McClure Associates, of which he and his wife are the sole shareholders. In his deposition, Paul McClure admitted that McClure Associates is the proper plaintiff in this action against respondents." 716 N.W.2d at 355 n.1.

the independent contractor agreement and the commission plan."); ECF No. 32-8 at Interrog. No. 20 ("Defendants determined the following commissions are earned and payable to Plaintiff.").) For these reasons, the Court concludes that Pridgen has standing as a commission salesperson to seek payment of commissions under Section 181.145.

**B.     *Statute of Limitations***

Defendants contend that some of Pridgen's claims for commissions under the MPWA are time-barred. According to Defendants, Minnesota Statute Section 541.07(5)'s two-year statute of limitations applies because Pridgen brings a MPWA claim, not a breach of contract claim. Pridgen asserts that Section 541.07(5) does not apply because the statute addresses "wages" and his claims are for commissions earned as an independent contractor, which are not "wages."

Section 541.07(5) provides that a two-year statute of limitations applies to claims "for the recovery of wages or overtime or damages, fees, or penalties accruing under any federal or state law respecting the payment of wages or overtime or damages, fees, or penalties." Minn. Stat. § 541.07(5). "[I]f the nonpayment is willful and not the result of mistake or inadvertence, the limitation is three years." *Id.* The term "wages" is defined as "all remuneration for services or employment, including commissions and bonuses . . . *where the relationship of master and servant* exists." *Id.* (emphasis added).

Pridgen was not an employee of 651 Carpets, and nothing before the Court suggests that these parties had a master-servant relationship. *See generally Frieler v.*

*Carlson Mktg. Grp., Inc.*, 751 N.W.2d 558, 569 (Minn. 2008) ("[T]he 'master-servant' concepts of agency are often used to define 'employer' and 'employee' terms."). Rather, Pridgen—and nearly all of 651 Carpets' sales representatives—were independent contractors. Thus, Pridgen is not seeking to recover "wages" and Section 541.07(5) does not apply to Pridgen's claims for unpaid commissions. *See McClure*, 716 N.W.2d at 359 (holding independent contractor was not seeking to recover "wages" under § 541.07(5) "because there was never a master-and-servant relationship between [the parties]"); *Gilbert L. Koehler, D.D.S., P.A. v. Hibbing Dental Servs., P.A.*, No. C4-88-1346, 1989 WL 10389, at *3 (Minn. Ct. App. Feb. 14, 1989) (holding that, as an independent contractor, plaintiff's conversion claim was "not a wage claim barred by Minn. Stat. § 541.07(5)"). Instead, the applicable statute of limitations for his commission claims is six years. *See McClure*, 716 N.W.2d at 359 (applying § 541.05, subdiv. 1(1)); Minn. Stat. § 541.05, subdiv. 1(1) (providing a six-year statute of limitations for actions "upon a contract or other obligation, express or implied, as to which no other limitation is expressly prescribed"). Pridgen began working for and earning commissions from 651 Carpets in 2017. (ECF No. 32-45.) He filed this action seeking unpaid commissions in 2020, within the six-year statute of limitations. Thus, his claims for unpaid commissions are not time-barred.

        *Penalties and attorneys' fees claims.* As Pridgen acknowledges, Section 541.07(5)'s two- or three-year statute of limitations applies to his claims for penalties and attorney

fees under Section 181.145. *See McClure*, 716 N.W.2d at 358 (holding that § 541.07(5) governs a commission salesperson's "claim for penalties and attorney fees under section 181.145"). Under Section 181.145, subdivision 3, an employer is liable for penalties "[i]f the employer fails to pay the salesperson commissions earned *through the last day of employment* on demand . . . ." (Emphasis added).

"[A] cause of action accrues when the right to institute and maintain a lawsuit arises, [and] when the action can be brought in a court of law without dismissal for failure to state a cause of action." *McClure*, 716 N.W.2d at 359. Pridgen's claims for penalties and attorney fees under Section 181.145 accrued on June 26, 2020, when he separated from 651 Carpets and demanded payment of his commissions and bonus. Pridgen sued in September 2020, within the two-year period, so his claims for penalties and attorneys' fees are not time-barred.[8]

## C.   *Specific Commissions Claims*

Pridgen and Defendants each move for partial summary judgment on Count VII for some (but not all) of Pridgen's claims for unpaid commissions.[9] The Court first

---

[8] The Court need not address the three-year statute of limitations for an employer's willful misconduct because Pridgen brought his claim within two years. Minn. Stat. § 541.07(5).

[9] The Court refers to each claim for unpaid commissions using the letter-number format adopted by the parties. The letter represents the category of commission claimed, and the number identifies the claim within that category. For example, the letter "D" represents sales that Pridgen's work orders and 651 Carpets' Total Sales Report show were completed, but for which there is no documentation of Pridgen being paid a commission.

addresses the uncontested commission claims. Then it addresses the contested claims for commissions.

1.    *Uncontested Commission Claims*

Pridgen concedes that he is not entitled to five commissions. (ECF No. 43 at 48 (citing D-46, E-22, F-32, F-51, and G-3).) He also abandons claims for most of the commissions on which Defendants move for summary judgment, explaining that he revised his claims during discovery. (*Id.* at 47–48 (comparing ECF No. 38-1 with ECF No. 32-19 to demonstrate Pridgen no longer seeks 240 commissions previously identified); ECF No. 31 at 4–12.) The Court grants summary judgment to Defendants on each of these uncontested claims.

Defendants concede that they did not pay Pridgen five commissions that he earned, amounting to $618.94. (ECF No. 31 at 12–13 (citing C-83, D-34, D-44, and two unnumbered commissions).) They also admit that they improperly withheld $360.95 in a commission check issued in November 2020. (*Id.* at 28 (citing D-47).) The Court grants summary judgment to Pridgen on his claims for these unpaid commissions.

2.    *Contested Commission Claims*

Defendants argue that genuine issues of material fact exist as to the remaining commission claims on which Pridgen seeks summary judgment. Pridgen acknowledges that fact issues preclude summary judgment on 15 of those claims. (ECF No. 52 at 19 (citing E-17, E-18, E-19, E-20, E-21, E-22, F-20, F-21, F-23, F-24, F-28, F-29, F-35, F-38, and

F-47).) The Court denies summary judgment on those claims. The Court addresses the remaining claims below, grouped by the parties' arguments.

*Statute of limitations and unaddressed commissions.* Defendants' defense for 43 unpaid-commission claims is that they are barred by Section 541.07(5).[10] (ECF No. 50 at 13.) The Court has rejected Defendants' statute of limitations argument for the reasons above. While Pridgen asserts that Defendants failed to otherwise respond to any of these and seven other unpaid–commission claims,[11] an affidavit from Fohrenkamm provides explanations of payment or reasons for nonpayment for 17 of the claims. (ECF No. 47 (addressing C-1, C-2, C-3, C-10, C-11, C-14, C-17, C-18, C-19, C-20, C-21, C-25, C-38, C-47, D-2, D-6, and D-20).) Because a genuine issue of material fact exists about these 17 claims, the Court denies summary judgment on them. Defendants do not otherwise respond to the other 33 claims.[12] Because Defendants fail to raise genuine issues of material fact as to these 33 claims, the Court grants summary judgment on them. *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for

---

[10] (ECF No. 46-18 (identifying the 43 allegedly time-barred commission claims: C-1, C-2, C-3, C-8, C-10, C-11, C-14, C-15, C-17, C-18, C-19, C-20, C-21, C-25, C-29, C-35, C-38, C-40, D-2, D-5, D-6, D-8, D-15, D-18, D-19, D-20, D-21, D-22, D-24, F-1, F-2, F-3, F-4, F-5, F-6, F-7, F-8, F-9, F-10, F-11, F-12, F-13, and F-15).)

[11] (ECF No. 52 at 12 n.2 (identifying the 43 allegedly time-barred commission claims as well as C-47, C-53, D-32, F-25, F-26, F-32, and F-42).)

[12] The 33 claims not addressed by Fohrenkamm's affidavit are C-8, C-15, C-29, C-35, C-40, C-53, D-5, D-8, D-15, D-18, D-19, D-21, D-22, D-24, D-32, F-1, F-2, F-3, F-4, F-5, F-6, F-7, F-8, F-9, F-10, F-11, F-12, F-13, F-15, F-25, F-26, F-32, and F-42.

summary judgment constitutes waiver of that argument."); *Trnka v. Biotel Inc.*, No. 07-CV-1206 (RHK/JSM), 2008 WL 108995, at *3 n.4 (D. Minn. Jan. 9, 2008) (finding a claim abandoned because plaintiff failed to respond to defendant's summary judgment arguments in her opposition brief).

*Open orders*. Defendants argue that seven orders are still open and were never completed. (ECF No. 50 at 13–14 (citing D-28, D-35, D-39, D-40, D-41, D-43, and H-7).) Pridgen contends that the fact that these orders remain open is "odd," (ECF No. 52 at 13), but a jury must decide whether he is entitled to commissions on them. The Court denies summary judgment on these seven claims.

*Canceled sales*. In response to claims D-33, D-38, and F-38, Defendants offer computer screenshots allegedly showing that these sales were canceled. (ECF No. 50 at 14.) Pridgen disputes this evidence. (ECF No. 52 at 13 (citing ECF No. 46-19).) Because a genuine issue of material fact exists, the Court denies summary judgment on these three claims.

*Work orders never entered*. Pridgen seeks commissions for 23 sales for which he produced work orders. Defendants contend that they have no record of these sales in the company system, and assert that Pridgen never submitted them to 651 Carpets. (ECF No. 50 at 14 (citing F-16, F-17, F-18, F-19, F-20, F-22, F-23, F-24, F-27, F-28, F-29, F-31, F-33,

F-34, F-35, F-36, F-38, F-39, F-41, F-45, F-47, F-68, and F-69[13]).) 651 Carpets' employee Brianna Clemings testified that Pridgen often failed to submit work orders. (ECF No. 39 ("Clemings Aff.") ¶¶ 6, 8.)

Pridgen argues that Defendants have the burden to disprove that he earned commissions on sales for which they have no records. He asks the Court to apply the Fair Labor Standards Act's ("FLSA") standard for determining uncompensated work to his MPWA claims. (ECF No. 31 at 29–31.) Under the FLSA, "[a]n employee who sues for unpaid overtime 'has the burden of proving that he performed work for which he was not properly compensated.'" *Holaway v. Stratasys, Inc.*, 771 F.3d 1057, 1059 (8th Cir. 2014) (citation omitted). "If an employer has failed to keep records, employees are not denied recovery under the FLSA simply because they cannot prove the precise extent of their uncompensated work." *Id*. If the employee offers "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference," then the employer bears the burden "to produce evidence to dispute the reasonableness of the inference." *Id.* (citation omitted). Pridgen does not cite, and this Court has not located, any case law applying this standard to a MPWA claim. Even if the Court were to apply this standard, summary judgment is not warranted.

---

[13] Defendants maintain that Pridgen was paid commissions for two of these claims: F-45 and F-47. (ECF No. 50 at 15–16.) But Defendants' payroll records do not appear to support this assertion. (*Compare id.*, *with* ECF No. 46-6 (payroll records).)

Pridgen's evidence of work orders does not raise a reasonable inference that he earned commissions. Given that Pridgen sometimes failed to submit work orders, and that 651 Carpets has no record of corresponding sales, a jury could find that Pridgen did not earn some or all of these commissions. And although Pridgen asserts that Defendants cannot benefit from their own inadequate recordkeeping, a jury may find that Defendants cannot be expected to keep records for work orders they never received.

Pridgen asserts that 15 of the work orders show that he collected payment from customers via credit card, and Defendants have not produced records of those charges being reversed or cancelled. (ECF No. 52 at 14; ECF No. 53 ¶ 2.) But this evidence does not show that these sales occurred. The Court finds that genuine issues of material fact exist as to whether Pridgen earned commissions on the sales for which 651 Carpets has no record. The Court thus denies summary judgment on the claims for which Pridgen produced a work order but Defendants have no record of a sale associated with that order.

*Transferred sales*. The parties dispute whether the sale associated with claim F-40 was taken over by another sales representative. (ECF No. 50 at 16; ECF No. 52 at 15.) Defendants cite general witness testimony about some sales being transferred to other representatives. Pridgen relies on a lack of supporting documentation, arguing that Defendants have records in other instances of a sales representative taking over a sale

and receiving the commission—but none here. The Court finds that a genuine issue of material fact exists about claim F-40, and denies summary judgment on this claim.

*Work orders produced late*. Defendants argue that six of Pridgen's claims for unpaid commissions fail because he did not produce corresponding work orders at the beginning of discovery. (ECF No. 50 at 16 (citing C-48, C-51, C-60, C-61, and D-26).) In his initial discovery responses, Pridgen stated that the work orders he produced at PRI000009-519 "represent *each sale for which Plaintiff alleges Defendants failed to pay him the full commissions he earned*." (ECF No. 46-20 at 4 (emphasis added).) Defendants assert that "Pridgen's claims should be limited to the ones actually identified by him in his response." (ECF No. 50 at 17.) Pridgen allegedly asked Defendants for, but never received, an accounting of the commissions he earned and was paid. (Compl. ¶¶ 48–49.) With hundreds of paper workorders to review, it is understandable that Pridgen and Defendants struggled to identify all of Pridgen's earned commissions and whether they were paid in full. Pridgen discovered these six unpaid commissions during discovery. (*See* ECF No. 32 ¶ 25 (describing "the most-recently updated" chart of unpaid commissions "identified in discovery"); ECF No. 32-19 (chart of allegedly unpaid commissions).) Defendants do not suggest that Pridgen's addition of these six claims unfairly prejudice them. But they do offer evidence that Pridgen was paid or provide reasons why Pridgen did not earn these commissions. (ECF No. 47.) Because genuine issues of material fact exist, the Court denies summary judgment on these claims.

*Self-generated sales commissions.* Finally, Pridgen argues that Defendants failed to pay Pridgen ten-percent commissions for six self-generated sales in April–June 2020 due to a software issue, leading to a shortfall of $831.01. (ECF No. 31 at 28 (citing E-17, E-18, E-19, E-20, E-21, and E-22).) Defendants contend that Pridgen was not entitled to ten-percent commission on those sales for two reasons. First, one sale was not self-generated. (ECF No. 50 at 8 (citing E-18).) Second, the sales failed to meet the company's conditions for a ten-percent commission because the products were sold below the approved sale price. (*Id.* at 8–11.) The Court finds that a genuine issue of material fact exists as to whether Pridgen was entitled to a ten-percent commission on these sales, and therefore denies summary judgment on these claims.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.  Pridgen's Motion for Partial Summary Judgement (ECF No. 29) is GRANTED IN PART and DENIED IN PART, as set forth above; and

2.  Defendants' Motion for Summary Judgement (ECF No. 34) is GRANTED IN PART and DENIED IN PART, as set forth above.

Dated: September 29, 2022                    BY THE COURT:

                                             s/Nancy E. Brasel
                                             Nancy E. Brasel
                                             United States District Judge